UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BELINDA JONES,

     Petitioner,                           Case No. 22-cv-11237
                                          Honorable Linda V. Parker

v.

JEREMY HOWARD,

     Respondent,

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner Belinda Jones ("Petitioner"), confined at the Huron Valley Women's Complex in Ypsilanti, Michigan, filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges her state-court conviction for second-degree murder in violation of Michigan Compiled Laws § 750.317. For the reasons that follow, the Court is denying the petition, declining to issue a certificate of appealability, but granting Petitioner leave to appeal in forma pauperis.

1

# I.   BACKGROUND

Petitioner originally was charged with assault with intent to commit murder. When the victim died after being hospitalized for more than two weeks, the charges were elevated to second-degree murder.

Petitioner subsequently was found guilty of the charge by a jury in the Circuit Court for Macomb County, Michigan.  This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals:

> Defendant's conviction arises from the stabbing death of James Williams.  At trial, defendant testified that she was acting in defense of her son, who was fighting with Williams, and that she stabbed Williams as he was reaching for a knife.  However, defendant gave inconsistent statements to the police before trial, claiming first that Williams had been attacked by several men whom she did not know, and later that she stabbed Williams because she had seen, or at least thought she saw, a knife in his waistband.  The trial court instructed the jury on both self-defense and defense of others, but the jury found defendant guilty, as charged, of second-degree murder.
>
> * * *
>
> The evidence, when viewed in a light most favorable to the prosecution, showed that Williams was irate over having been robbed and was looking for the people who had robbed him to get his money back.  He armed himself with a long, stick-like object and possibly a knife.  He ended up in front of defendant's house, where defendant was sitting on the porch.  According to defendant, Williams made death threats.  However, he never acted on those threats.  Before he could do anything, Deangelo Jones tackled him and knocked him to the ground, other men joined in, and they assaulted Williams and disarmed him.  Curtis Williams testified that defendant approached and stabbed James Williams after he had been disarmed.

*People v. Jones*, No. 330113, 2017 WL 3613902, at *1, 4 (Mich. Ct. App. Aug. 22, 2017).  These facts are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1).  *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009)

Petitioner's conviction was affirmed on appeal.  *Jones*, 2017 WL 3613092, *leave denied* 910 N.W.2d 278 (Mich. 2018).  Petitioner subsequently returned to the trial court to file a post-conviction motion for relief from judgment pursuant to Michigan Court Rule 6.500.  The trial court denied the motion.  *People v. Jones*, No. 2014-00317-FC (Macomb Cnty. Cir. Ct. Dec. 12, 2019), *reconsideration den.* No. 2014-00317-FC (Macomb Cnty. Cir. Ct. Feb. 5, 2020); (ECF No. 10-11 & ECF No. 10-14 at PageID 6833-34.)  The Michigan appellate courts denied Petitioner leave to appeal.  *People v. Jones*, No. 354505 (Mich. Ct. App. Nov. 4, 2020), *leave denied* 971 N.W. 2d 615 (Mich. 2022) (ECF No. 10-14 at PageID 6704.)

Petitioner seeks a writ of habeas corpus on the following grounds:

I.  A writ of habeas corpus should issue where the hearing court should have granted petitioner's motion to suppress her out of court statement to detectives where a reasonable person in petitioner's shoes, taking account of petitioner's mental retardation would not have felt herself free to terminate questioning by police detectives.

II.  A writ of habeas corpus should issue where postconviction investigation revealed false, erroneous and mistaken medical evidence was used to establish the conviction, clearly made up by the State

3

expert witness, Dr. Mary Pietrangelo, without correction by the prosecution, and the jurors were repeatedly encouraged by the prosecution to convict petitioner based on the false, erroneous and mistaken medical evidence, and the prosecution knew of the falsity but persisted in its use no matter of mistral or reversal of the conviction, and by engaging in inappropriate prosecutorial misconduct should be prohibiting from retrying this matter.

III.  A writ of habeas corpus should issue where defendant trial counsel rendered ineffective assistance when: (A) defense trial counsel failed to object to the false, erroneous and mistaken evidence and have it corrected, and failed to present defense expert testimony in rebuttal of the false, erroneous and mistaken evidence; (B) defense trial counsel failed to raise the defendant's limited intellectual capacity as relevant to whether she was in custody when she gave statements in a parking lot; (C) failed to request a continuance in order to make Dr. Ali Saad available as a defense witness; and (D) failed to move for a new trial on the basis that the jury's verdict was against the great weight of the evidence with respect to self defense or defense of others.

IV.  A writ of habeas corpus should issue where the state court failed to provide a remedy for the violation of [Michigan Compiled Laws § ]780.961, which was a deprivation of petitioner's due process rights.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes

the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

AEDPA "imposes a highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A "readiness to attribute error [to a state

court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

## III.   DISCUSSION

### A.   *Miranda* - Claim 1

Petitioner first argues that the trial court erred in failing to suppress her statement to detectives, made without Petitioner being advised of her *Miranda* rights.  Petitioner claims she was in custody when she made the statement and, therefore, should have been advised first of her *Miranda* rights.  Petitioner further argues that the trial court and Michigan Court of Appeals failed to consider her mental disability and limited intelligence when rejecting her argument that her statement was obtained in violation of *Miranda*.

The Michigan Court of Appeals rejected these assertions, reasoning:

> The trial court's ruling indicates that it accepted the testimony of the officers, Emerson and Gilbert, over that of defendant and her sister, whom it found to be incredible.  The officers' testimony established that defendant was believed to have been involved in the fight, but was not a suspect in Williams's stabbing.  Emerson's lieutenant contacted defendant to arrange a meeting, defendant consented to the meeting, and it was agreed that the meeting would take place at a McDonald's restaurant.  Defendant arranged her own transportation to the meeting location.  Defendant approached the detectives' car without being signaled, walked around to the driver's side of the vehicle, and spoke to Emerson through his open window. At the end of the interview, Emerson asked defendant if she would provide a written statement and she agreed.  He handed her a pen and paper and she began to write.  He then offered to let her sit in the car where it was warm and defendant accepted.  Defendant sat in the

6

backseat.  The car was a standard-issue vehicle and was not equipped with any special restraints that would have prevented defendant from opening the door had she wanted to leave.  Defendant admitted that she did not try to open the door and simply assumed it was locked.  The officers did not speak to defendant while she was in the car writing her statement.  After defendant completed her written statement, she got out of the car and went home with her sister.  The entire episode lasted no more than one hour and defendant was not placed in handcuffs or told that she was under arrest.  Given the totality of the circumstances, the trial court correctly determined that defendant was not in custody and thus her statements were admissible.

Defendant argues that the evidence presented at the hearing was insufficient to determine the issue because defense counsel alluded to her "limited intellectual capacity," but did not develop the issue sufficiently for the trial court to take it into consideration.  We disagree.  In *J D B v. North Carolina*, 564 US 261 . . . (2011), the Court confirmed that a determination of custody is an objective analysis based on the totality of the circumstances, *id.* at 270-271, but held that, given the inherent differences between children and adults, a child's age is a factor that can be taken into account when the child's age is known to the officer at the time of questioning or "would have been objectively apparent to a reasonable officer[.]"  *Id.* at 271-277.  Defendant argues that, in light of that decision, other individual characteristics of the person questioned are also relevant to the determination of custody, such that evidence of her limited intellectual capacity should have been developed and considered.  However, the majority decision in *J D B* specifically notes that its holding "neither invites consideration of whether a particular suspect is 'unusually meek or compliant,' . . . nor 'expan[ds]' the *Miranda* custody analysis . . . into a test that requires officers to anticipate and account for a suspect's every personal characteristic[.]"  *Id.* at 275 n 7.  But see *People v. Braggs*, 209 Ill 2d 492, 510-511; 810 NE2d 472 (2004)(a defendant's mental retardation is a factor to be considered in determining whether the defendant was in custody).

In this case, defendant testified that she had a mental disability, but did not know the nature of the disability.  While testimony at trial and the presentence investigation report (PSIR) indicated that defendant had been diagnosed with mental retardation and had a low

7

> IQ score, this Court's review is limited to "the information known to
> the trial court at the time it denied [the defendant's motion] to
> suppress." *People v. Burrell*, 417 Mich. 439, 449; 339 N.W.2d 403
> (1983).  In any event, defendant presented no evidence to show that
> her mental disability impaired her ability to understand the
> circumstances surrounding the giving of her statement, nor did she
> show that her disability was known to the detectives or would have
> been objectively apparent to a reasonable officer.  Even in the *Braggs*
> case, the court found that "the police knowingly exploited defendant's
> mental retardation." *Braggs*, 209 Ill 2d at 513.  Accordingly,
> defendant's alleged mental disability is not a relevant consideration in
> this case.

*Jones*, 2017 WL 3613902, at *2.  As discussed below, the state court's

decision is not based on an unreasonable determination of the facts, and it is

not contrary to or based on an unreasonable application of Supreme Court

precedent.

It is well established that a defendant's statements stemming from custodial

interrogation may not be used by the prosecution unless it "demonstrates the use of

procedural safeguards effective to secure the privilege against self-incrimination."

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "[U]nless other fully effective

means are devised to inform accused persons of their right of silence and to assure

a continuous opportunity to exercise it," the well-known *Miranda* warning

statements must be provided to a suspect.  *Id*.  However, "police officers are not

required to administer *Miranda* warnings to everyone whom they question.  Nor is

the requirement of warnings to be imposed simply because the questioning takes

place in the [police] station house, or because the questioned person is one whom

the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Instead, "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him or her 'in custody.'" *Id.*

"Custody," for purposes of *Miranda,* "requires a significant deprivation of freedom." *Mason v. Mitchell*, 320 F.3d 604, 632 (6th Cir. 2003). "Two discrete inquiries are essential to the [in-custody] determination." *Thompson v. Keohane*, 516 U.S. 99, 112 (1992). "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id*. (footnote omitted). The Michigan Court of Appeals made these two inquiries and reasonably concluded that Petitioner was not subjected to custodial interrogation, to require the giving of *Miranda* warnings.

First, as the facts found by the Michigan Court of Appeals established— which are presumed correct and, in fact, are supported by the record (*see* ECF No. 9-13 at PageID 4640-4701)—Petitioner agreed to speak with the detectives and met them at a location she requested. Petitioner initially spoke with the detectives and told them what happened while she stood outside their car. *See Hart v. Steward*, 623 F. App'x 739, 745-46 (6th Cir. 2015) (habeas petitioner was neither in custody, nor subjected to interrogation, for *Miranda* purposes, when he made incriminating statements regarding murder weapon and its disposal to law

enforcement agent who was standing with petitioner outside of his vehicle in the driveway of petitioner's residence).  It was only when the officers asked Petitioner to provide a written statement and they asked her if she wanted to sit in the car because it was cold outside, that Petitioner got into the officers' vehicle.  Because Petitioner's incriminating statements were first made prior to her getting into the detectives' vehicle, any subsequent "physical restraint is arguably inconsequential." *United States v. Cruz-Rivera*, 14 F.4th 32, 49 (1st Cir. 2021).

It also was not unreasonable for the state court to conclude that Petitioner was not in custody even after she got into the detectives' vehicle.  "Detention in a police car does not automatically constitute an arrest." *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir.1996) (internal citations omitted).  Here, Petitioner voluntarily got into the vehicle.  It was not a marked police car and did not have any of the usual trappings of a police vehicle (e.g., overhead lights, a divider between the rear passenger compartment and front seat, or locks preventing a person from exiting the rear passenger area).  At no time during this meeting was Petitioner handcuffed; nor was she ever told that she was under arrest.  After Petitioner completed her written statement, the detectives thanked her for her time and Petitioner was allowed to leave the vehicle and return home.

These circumstances support the state court's findings that Petitioner was not in custody when she provided her oral and written statements to the police.  *See*

*United States v. Woodson*, 30 F.4th 1295, 1304-05 (11th Cir. 2022) (defendant was not in "custody" for *Miranda* purposes; at beginning of interview, defendant was advised that he was not under arrest, that he was not charged with crime, and that conversation was voluntary, defendant was not handcuffed during interview, defendant sat in front passenger seat of police van, not back seat, where arrestees were typically placed, there was no indication that vehicle's doors were locked, and the van featured none of the trappings of a typical police vehicle, as it had no insignia, radio, cage, bar, or visible switch to its lights); *United States v. Bordeaux*, 400 F.3d 548, 559-60 (8th Cir. 2005) (defendant was not in custody for *Miranda* purposes when FBI agent, accompanied by tribal police force member, interviewed suspect; agent asked suspect whether he wanted to be interviewed in his apartment or in unmarked police vehicle and suspect chose vehicle, no weapons were shown, agent informed suspect that he was not under arrest and would not be arrested at interview's conclusion and that suspect's participation was voluntary and that he could end interview at any time, doors to vehicle were unlocked, suspect exited interview at one point to use restroom alone and returned voluntarily, and suspect himself stopped interview after 90 minutes and stated that he would not answer more questions without attorney); *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996) ("the fact that Murray was questioned while seated in the back of the squad car did not put him 'in custody' for purposes of *Miranda* warnings . . . Once

the police announced that Murray was under arrest and he was put in handcuffs, he was 'in custody' for purposes of *Miranda*.  His statements prior to that time were correctly found to be admissible during the trial").

Petitioner argues that the state courts should have found *Miranda* warnings necessary due to her mental disability and low intelligence quotient (IQ) of 67.  However, Petitioner identifies no Supreme Court precedent holding that an adult, as opposed to a juvenile, must be given *Miranda* warnings due to his or her mental disability.[1]  "Since *Miranda*'s custody determination is to be made using an objective standard, the Supreme Court has not typically considered whether a defendant is more susceptible to police pressure due to her subjective characteristics, such as her mental health."  *United States v. Patterson*, 393 F. Supp. 3d 456, 465 (E.D. La. 2019) (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 282-98 (2011) (Alito, J., dissenting)).  "The subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.  *J.D.B*, 564 U.S. at 271 (citing *Stansbury v. California*, 511 U.S. 318, 323 (1994); then quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004)).

---

[1] While an individual's mental health is one of several circumstances relevant to determining the voluntariness of a confession, *see Amunga v. Jones*, 51 F. App'x 532, 537 (6th Cir. 2002) (citing *Withrow v. Williams*, 507 U.S. 680, 693 (1993)), none of the other relevant factors (e.g., the length of the interrogation, its location, its continuity, the defendant's maturity, education, or physical condition) suggest that Petitioner's statement was involuntary.

In fact, the Sixth Circuit has expressly found defendants not entitled to

*Miranda* warnings and that their confessions were not obtained in violation of the

Constitution, simply due to their mental deficiencies. *See United States v.*

*Macklin*, 900 F.2d 948, 949-51 (6th Cir. 1990) (concluding that the defendants

were not entitled to *Miranda* warnings based on their low IQs of 59 and 70, where

they were not in custody during questioning by government agents in front of their

home, particularly as an agent repeatedly told the defendants they were not under

arrest and were free to cut off questioning at any point).  Other Circuits have

reached the same conclusion.  *See, e.g., Bordeaux*, 400 F.3d at 560

("notwithstanding his low IQ, it was not reasonable for [the defendant] to believe

that he was in custody: No great mental acumen was required to understand his

situation"); *Johnson v. Harkleroad*, 104 F. App'x 858, 861-67 (4th Cir. 2004)

(finding habeas petitioner not in custody, for purposes of *Miranda,* in spite of his

diminished mental state, resulting from his prior history of drug and alcohol abuse

and excessive use of drugs and alcohol several hours prior to the interview with the

police, where the interview was initiated with the petitioner's consent, and

continued after police repeatedly told him that he was not in custody and thus free

to leave); *Purvis v. Dugger*, 932 F.2d 1413, 1417-19 (11th Cir. 1991) (petitioner

not in custody when he went voluntarily to police station and confessed to a

psychiatrist, in spite of petitioner's prior history of psychological treatment and

13

that he was a "suggestible submissive and childlike schizophrenic with an eight-year-old's understanding of waiver of his rights").

The Michigan Court of Appeals reasonably found that Petitioner was not in custody when she made her statements, despite her mental disability and low IQ. Therefore, the state court reasonably concluded that Petitioner's rights were not violated due to the lack of *Miranda* warnings. Petitioner is not entitled to relief on her first claim.

### B.    Newly Discovered Evidence/Perjury - Claim 2

Petitioner next claims that she is entitled to a new trial because of newly discovered evidence. This evidence, Petitioner claims, shows that the medical examiner changed her testimony between Petitioner's trial and her son Deangelo Jones' subsequent trial concerning the number of stab wounds the victim received.

At Petitioner's trial, the medical examiner testified that the victim had eight sharp impact injuries on his body, all the result of stabbing or incising. (ECF No. 9-20 at PageID 5015-22.) The medical examiner further testified that the three-inch stab wound in the left armpit area resulted in the victim's lung being punctured. (*Id*. at PageID 5018-19.) She provided that the victim also suffered a stab wound that was approximately three-quarters of an inch deep that hit one of the surface coverings of the right lung which can cause the lung to collapse. (*Id.* at PageID 5021.) The medical examiner concluded that the victim's cause of death

14

was "anoxic encephalopathy status post cardiopulmonary arrest with resuscitation due to multiple stab wounds of the torso." (*Id.* at PageID 5025.)  She explained that the victim suffered brain injuries and cardiac arrest from the complications from the stab wounds he suffered.  (*Id.*)  The medical examiner also testified that there was nothing from the hospital records showing the hospital somehow caused the victim's death.  (*Id.* at PageID 5026.)

Petitioner submits the same medical examiner's testimony from her son's trial.  (ECF No. 4-19 at PageID 1941-80.)  There, the medical examiner again testified that the victim's cause of death was "anoxic encephalopathy status post cardiopulmonary arrest with resuscitation due to multiple stab wounds of the torso." (*Id.* at PageID 1950.)  However, she now testified that there were three stab wounds and one incised wound on the body.  (*Id.* at PageID 1956-57.)

The medical examiner explained that her assessment of the number of wounds had changed since her previous testimony because further review of the victim's autopsy records showed that what she originally believed were stab wounds were medical interventions or chest tube wounds.  (*Id.* at PageID 1958.)  The medical examiner described the three stab wounds as being the wounds she previously testified caused the victim's death.  (*Id.* at PageID 1959-60, 1967.)  She explained that these three stab wounds remained the cause of death "because they

15

are the injury which initiated the entire series of events where he wound up deceased." (*Id.* at PageID 1967.)

To the extent Petitioner seeks habeas relief based on a claim that the change in the medical examiner's testimony establishes Petitioner's actual innocence, she would not be entitled to the issuance of a writ.  In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court explained that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400.  "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution[,] not to correct errors of fact." *Id.*; *see also McQuiggin v. Perkins,* 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence").  Freestanding claims of actual innocence are thus not cognizable on federal habeas review, absent independent allegations of constitutional error at trial.  *See Cress v. Palmer,* 484 F.3d 844, 854-55 (6th Cir. 2007) (collecting cases).

Moreover, to establish a constitutional due process claim arising from a state court's denial of a motion for new trial based on newly discovered evidence, a habeas petitioner "must demonstrate that the trial court's denial of his [or her] motion for new trial was 'so egregious' that it violated his [or her] right to a

16

fundamentally fair trial." *Pudelski v. Wilson*, 576 F.3d 595, 611 (6th Cir. 2009) (citing *Fleming v. Metrish*, 556 F.3d 520, 535 (6th Cir. 2009); *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004)).  Petitioner fails to show that the state court's refusal to grant her a new trial based on the change in the medical examiner's testimony violated her right to a fundamentally fair trial.

As the trial judge stated at great length in denying Petitioner's claim on post-conviction review, there was no dispute that Petitioner stabbed the victim. (ECF No. 10-11 at PageID 5973-75.)  No one testified that they saw anyone else stab the victim.  (*Id.* at PageID 5974.)  The medical examiner's altered testimony did not correlate with Petitioner's trial testimony that she stabbed the victim only one time.  The trial court also noted that the Michigan Court of Appeals on direct review of Petitioner's conviction placed no importance on the number of stab wounds in rejecting Petitioner's self-defense claim, but looked at the fact that the victim had already been tackled to the ground by Petitioner's son and that other men had joined in, assaulting and disarming the victim before Petitioner approached and stabbed him.  The Michigan Court of Appeals also noted that the discrepancies in Petitioner's statements regarding why she stabbed the victim suggested that the evidence was sufficient to prove that she did not act in self-defense.  The trial judge also rejected Petitioner's argument that the stab wounds were not life threatening by noting that the jury in Petitioner's son's case found

17

him guilty of second-degree murder and assault with intent to do great bodily harm despite the medical examiner testifying that the victim was stabbed only three times. (*Id.*)

Although the medical examiner changed her testimony concerning the number of stab wounds at Petitioner's son's trial, she still testified that these remaining wounds were severe and were the cause of the victim's death. The medical examiner's testimony at this second trial still contradicted Petitioner's trial testimony that she stabbed the victim one time. Further, the medical examiner's correction did not alter the fact that the evidence, when viewed in a light most favorable to the prosecution, established that Petitioner stabbed the victim when he was already on the ground and had been restrained and disarmed. Petitioner has not shown that there would be a different result if she was granted a new trial based on this newly discovered evidence.

Petitioner also is not entitled to habeas relief based on her assertion that the medical examiner committed perjury at her trial. "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotation marks omitted). There also is a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted). To prevail on a false-

testimony claim, a defendant "must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).  The testimony must have been " 'indisputably false,' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000) (quoting *Lochmondy*, 890 F.3d at 823).

The trial court rejected Petitioner's false-testimony claim, finding no evidence that the prosecutor knew the victim had been stabbed only three times when the medical examiner testified that there were more stab wounds during Petitioner's trial.  (ECF No. 10-11 at PageID 5975.)  The trial court also found the testimony immaterial as the number of stab wounds was not significant to the jury's determination with respect to Petitioner's claim that she acted in self defense or the defense of others.  (*Id*. at PageID 5976.)  These were reasonable determinations.

Petitioner argues that the prosecutor knew that the medical examiner was lying about the number of stab wounds because at least one of the treating doctors at the hospital indicated in notes that the victim had been stabbed only three times. However, "[t]he testimony of an expert is not perjury merely because it differed from opinions of other experts." *Couch v. Booker*, 650 F. Supp. 2d 683, 699 (E.D. Mich. 2009) (State's expert did not commit perjury in his testimony as to the cause

of victim's death in a murder prosecution, even though another pathologist reached a different conclusion as to the cause of death).  The only other evidence of perjury that Petitioner offers is that the medical examiner changed her opinion as to the number of stab wounds that the victim suffered between Petitioner's trial and the trial of Petitioner's son.  But the medical examiner did so after her further review of the records showed that some of the initial wounds were from medical interventions or chest tube wounds.  In other words, she initially reviewed or interpreted the records incorrectly.  There is no indication that the medical examiner intentionally testified falsely at Petitioner's trial.

In any event, Petitioner cannot show that the change in testimony was material.  Significantly, the medical examiner's testimony was consistent at both trials that, regardless of the number of stab wounds, it was the stab wounds that caused the victim's death.  The medical examiner's change in testimony concerning the number of stab wounds was a "mere inconsistenc[y]" which does not establish that the prosecution knowingly used false testimony.  *See Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014).  Even if Petitioner could show that the medical examiner testified falsely *and* that the prosecution knew or should have known of the perjury, Petitioner cannot show any likelihood that the testimony could have affected the jury's verdict.  *Id.* at 757-58.  As the trial court pointed out, the jury found Petitioner's son guilty of second-degree murder and assault with

20

intent to do great bodily harm despite hearing that the victim had been stabbed only three times.

Petitioner is not entitled to relief on her second claim.

## C. Ineffective Assistance of Counsel - Claim 3

Petitioner next alleges she was denied the effective assistance of counsel.

A defendant must satisfy a two-prong test to establish the denial of the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. *Id.* The defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id*. at 689. In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted).

Second, the defendant must show that such performance prejudiced the defense. *Id*. at 687. To demonstrate prejudice, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "*Strickland* places

the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Petitioner first argues that defense counsel should have objected to the medical examiner's false or perjured testimony.  As discussed above, Petitioner fails to show that the medical examiner committed perjury at her trial.  Counsel, therefore, was not ineffective for failing to raise the asserted challenge.  *See Brown v. Burt*, 65 F. App'x. 939, 942 (6th Cir. 2003) (concluding that, absent evidence of perjury, counsel was not ineffective for failing to demonstrate perjury through cross-examination of witness).

As a related claim, Petitioner argues that her trial counsel should have called an expert witness to challenge the medical examiner's findings as to the number of stab wounds and cause of death.  The first attorney representing Petitioner informed the trial court during a pre-trial proceeding that he had retained an unnamed nurse, who reviewed the victim's medical records and concluded he died from a heart attack and not from the stab wounds.  (ECF No. 4-3 at PageID 436.) This nurse was never identified and did not testify at Petitioner's trial.

Nor was there testimony from Dr. Francisco Diaz, who the court had appointed as an independent medical examiner for the defense approximately six months before trial.  (ECF No. 10-8 at PageID 5907-08.)  Petitioner has not

22

provided an affidavit from Dr. Diaz establishing what his proposed testimony would have been or how it would aid the defense.

A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006); *see also Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (rejecting ineffective assistance of counsel claim for failure to call expert when the petition did not identify an expert who would have reached opinions and given testimony contrary to the prosecutor's experts). Petitioner offers no evidence that there was an expert who would have challenged the medical examiner's findings that the stab wounds, regardless of number, caused the victim's death. In the absence of such proof, Petitioner is unable to establish that she was prejudiced by counsel's failure to call an expert to testify at trial, so as to support the second prong of her ineffective assistance of counsel claim. *See Clark v. Waller*, 490 F. 3d 551, 557 (6th Cir. 2007).

Moreover, this Court would be unable on federal habeas review to entertain an affidavit from Dr. Diaz or this unnamed nurse. Habeas review under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). *Cullen* precludes this Court from considering any new evidence that Petitioner would even want to present at this point in support of his ineffective assistance of trial counsel claim.

23

*Cf. Campbell v. Bradshaw*, 674 F.3d 578, 590, n.3 (6th Cir. 2012) (declining to consider testimony taken in federal evidentiary hearing because it was not part of the state court record).

Notably, Petitioner's trial counsel cross-examined the medical examiner at length concerning her findings. (*See* ECF No. 9-20 at PageID 5032-51.)  Through counsel's cross-examination, the medical examiner admitted the victim contracted pneumonia while hospitalized and subsequently suffered a heart attack. (*Id.* at PageID 5033-34.)  The medical examiner additionally acknowledged during cross-examination that an emergency room doctor reported that the victim's wounds were not life-threatening. (*Id.* at PageID 5037-38.)  The medical examiner further testified in response to defense counsel's questions that the victim had a history of hypertension and seizure disorders. (*Id.* at PageID 5038.)  She admitted that medical malpractice could be an intervening cause of death in some cases. (*Id.* at PageID 5039-40.)  She testified on cross-examination, as well, that the victim had marijuana and alcohol in his system and was combative when he was admitted to the hospital. (*Id.* at PageID 5043-47, 5050.)  The Supreme Court has found that "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Richter*, 562 U.S. at 111.  Defense counsel attempted to do so here by bringing out testimony that other causes may have led to the victim's death.

Petitioner next contends that trial counsel was ineffective for failing to present evidence of Petitioner's limited intelligence at the suppression hearing to establish that she was in custody for purposes of *Miranda*. As discussed earlier with respect to Petitioner's first claim, Petitioner was not in custody when she spoke to the detectives and any obligation to provide *Miranda* warnings was not dependent on her intellectual capabilities. There was no reasonable probability that a motion to suppress based on an alleged *Miranda* violation would have succeeded had defense counsel presented evidence of Petitioner's limited intelligence. Thus, Petitioner was not denied effective assistance by her trial counsel's failure to move for the suppression of her statement on this basis.

Petitioner next contends that counsel was ineffective for failing to request a continuance to secure the emergency room doctor's testimony, presumably consistent with his statement to a police officer that the victim's injuries were not life threatening. On direct appeal, the Michigan Court of Appeals rejected this claim, reasoning:

> Even if a continuance would have been warranted, defendant has not shown that she was prejudiced by counsel's failure to request one. Although defendant suggests that Dr. Saad may have provided evidence that Williams died from some intervening cause unrelated to his stab wounds, defendant has not made an offer of proof of Dr. Saad's proposed testimony and the record indicates only that Dr. Saad may have testified that Williams's stab wounds were not life-threatening at the time he was admitted to the hospital. The record does not indicate that Dr. Saad would have testified that Williams's injuries were not a proximate cause of his death. Because defendant

> has not established factual support for any claim that counsel's
> omission deprived her of important exculpatory evidence or a
> substantial defense, this claim must fail.

*Jones*, 2017 WL 3613902, at \*6.  This reasoning was neither contrary to, nor an

unreasonable application of, clearly established federal law.

Petitioner has not presented an affidavit from the emergency room

physician—to the Michigan courts or this Court—concerning his proposed

testimony and willingness to testify on Petitioner's behalf.[2] Conclusory allegations

of ineffective assistance of counsel, without any evidentiary support, do not

provide a basis for habeas relief.  *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir.

1998).  In the absence of such evidentiary support, Petitioner is unable to establish

the second *Strickland* prong—prejudice as a result of counsel's failure to call the

emergency room doctor at trial, and therefore to seek a continuance to secure the

doctor's testimony.  In any event, testimony that the victim's stab wounds were not

initially life threatening at the time of his admission to the hospital would not

negate a finding that the wounds ultimately led to his subsequent medical

complications and resulting death.

---

[2] Again, on federal habeas review, this Court would be precluded from
considering any affidavit from the emergency room physician as review under
§ 2254(d) is "limited to the record that was before the state court that adjudicated
the claim on the merits."  *Pinholster*, 563 U.S. at 181.

Under Michigan law, "[t]o warrant a homicide conviction, the death must be the natural and probable consequence of the unlawful act and not the result of an independent intervening cause in which the accused does not participate and which he cannot foresee." *People v. Clark*, 431 N.W.2d 88, 89 (Mich. Ct. App. 1988). The prosecution does not need to prove that the defendant's conduct was "*the* sole cause" of death, but only that the conduct "was *a* substantial factor in producing the harm." *People v. Bailey*, 549 N.W.2d 325, 334 (Mich. 1996) (emphasis added). Causation is a question of fact for the jury. *Clark*, 431 N.W.2d at 89. The prosecution can prove the element of proximate cause beyond a reasonable doubt where non-fatal wounds "cause death indirectly through a chain of natural effects and causes unchanged by human action." *People v. Thomas*, 272 N.W.2d 157, 161 (Mich. Ct. App. 1978) (quoting 26 Am. Jur. Homicide § 52 at 195).

Under Michigan law, "[w]here an independent act of a third party intervenes between the act of a criminal defendant and the harm to a victim, that act may only serve to cut off the defendant's criminal liability where the intervening act is the sole cause of harm." *Bailey*, 549 N.W.2d at 334 (citations omitted). In the context of medical treatment, "evidence of grossly negligent treatment constitutes evidence of a sole, intervening cause of death. Anything less than that constitutes, at most, merely a contributory cause of death, in addition to the defendant's conduct." *Id.* At 335; *see also People v. Herndon*, 633 N.W.2d 376, 396 (Mich. Ct. App. 2001)

(quoting *Bailey*, 549 N.W.2d at 334).  Moreover, under Michigan law,

"[i]ntervening medical error is not available as a defense to a defendant who has

inflicted a mortal wound upon a victim."  *People v. Williams*, 310 N.W.2d 246,

248 (Mich. Ct. App. 1981), *rev'd on other grounds* 413 Mich. 940 (1982).

Therefore, "[a]lthough the intervening cause doctrine may not absolve the

defendant of criminal responsibility when there is a causal link between a nonfatal

injury and the victim's death, it most definitely does not apply to an injury that is

fatal."  *Herndon*, 633 N.W.2d at 397 (internal footnotes omitted).

Because Michigan law requires that a defendant's conduct be only "a" cause

of the victim's death, and not the sole cause, the fact that the victim may have

developed medical complications after being hospitalized which contributed to his

death did not negate that Petitioner's act of stabbing the victim was a substantial

cause of his death, because "joint mutual causes do not excuse culpable behavior."

*Danielak v. Brewer*, 747 F. App'x 339, 345 (6th Cir. 2018).  Because Michigan

law provides that a person can be convicted of murder if his or her conduct

contributed to the victim's death, any decision by Petitioner's counsel to forego a

causation defense in favor of a self-defense argument was reasonable.  *See Moore*

*v. Steward*, 948 F. Supp. 2d 826, 846 (W.D. Tenn. 2013).  This is particularly so in

the absence of any evidence challenging the medical examiner's findings that the

victim died as a result of the wounds Petitioner inflicted.

Petitioner lastly contends that trial counsel was ineffective for failing to move for a new trial on the ground that the verdict went against the great weight of the evidence because the prosecutor failed to disprove that she acted in self-defense.  The Michigan Court of Appeals rejected this claim based on its finding that there was sufficient evidence from which the jury could conclude that Petitioner did not act in self-defense. *Jones*, 2017 WL 3613902, at *6.  As the state court explained:

> The evidence, when viewed in a light most favorable to the prosecution, showed that Williams was irate over having been robbed and was looking for the people who had robbed him to get his money back.  He armed himself with a long, stick-like object and possibly a knife.  He ended up in front of defendant's house, where defendant was sitting on the porch.  According to defendant, Williams made death threats.  However, he never acted on those threats.  Before he could do anything, Deangelo Jones tackled him and knocked him to the ground, other men joined in, and they assaulted Williams and disarmed him.  Curtis Williams testified that defendant approached and stabbed James Williams after he had been disarmed.  Evidence that James Williams was on the ground and unarmed when he was stabbed was sufficient to prove beyond a reasonable doubt that defendant did not have an honest and reasonable belief that she or her son were in imminent danger of serious harm or death.  While defendant questions the credibility of Curtis Williams's testimony, "[w]itness credibility and the weight accorded to evidence is a question for the jury, and any conflict in the evidence must be resolved in the prosecution's favor."

*Id.* at *4 (quoting *People v. McGhee*, 709 N.W.2d 595, 613 (Mich. Ct. App. 2005)).

Under Michigan law, "one acts lawfully in self defense if he [or she] honestly and reasonably believes that he [or she] is in danger of serious bodily harm or death, . . . as judged by the circumstances as they appeared to the defendant at the time of the act." *Blanton v. Elo*, 186 F.3d 712, 713, n. 1 (6th Cir. 1999) (citing *People v. Heflin*, 456 N.W.2d 10, 18 (1990)) (internal quotation marks and additional citation omitted); *see also* Mich. Comp. Laws § 780.972. To be lawful, one generally may not use more than the force necessary to defend oneself. *Morningstar v. Worthy*, 454 F. App'x 391, 404 n.10 (6th Cir. 2011) (quoting *People v. Roper*, 777 N.W.2d 483, 491-92 (Mich. Ct. App. 2009)). The right to act in self-defense also includes the right to defend another person. *See* Mich. Comp. Laws § 780.972.

Although Petitioner testified that she stabbed the victim once in self-defense or in defense of her son, there was testimony that Petitioner's son and two other men were already on top of and attempting to disarm or had disarmed the victim when Petitioner stabbed him. (ECF No. 10-3 at PageID 5490-95, 5507, 5524.) The same witness testified that he attempted, without success, to keep Petitioner from joining the scuffle by telling her that the other men had restrained the victim already. (*Id.* at PageID 5493, 5494-96.) Another witness testified that she saw the victim getting "stomped" and kicked by three or four men; and, at that point, the victim did not appear to have the knife or pipe and did not appear to be a threat

30

anymore. (*Id.* at PageID 5545-48.)  Petitioner's own testimony that her son and two other men had intervened and disarmed the victim before Petitioner stabbed the victim undermines her own self-defense claim.  (ECF No. 10-4 at PageID 5714-19.)  Petitioner testified that she stabbed the victim only one time even though there was evidence that the victim had been stabbed multiple times and that only Petitioner stabbed the victim.  (*Id.* at PageID 5720-21.)  Significantly, Petitioner admitted at trial that she did not tell the responding officers on the night in question that she stabbed the victim, nor did she mention that the victim had a knife and had pulled it out.  (*Id.* at PageID 5723-26.)

From these circumstances, a jury could reasonably reject Petitioner's self-defense claim and conclude she stabbed the victim when he was no longer a threat, in that he had been subdued and disarmed.  Because there was sufficient evidence to rebut Petitioner's self-defense claim, her counsel was not ineffective for failing to move for a new trial on the ground that the verdict went against the great weight of the evidence.  Petitioner is not entitled to relief on her third claim.

**D.      Failure to Comply with Michigan Compiled Law § 780.961(2) - Claim 4**

Petitioner lastly argues that she is entitled to habeas relief because the Michigan Court of Appeals failed to provide a remedy for an alleged violation of Michigan Compiled Laws § 780.961(2), which provides that the prosecutor must present evidence at the time of the warrant issuance, at the preliminary

examination, and at trial that the defendant's actions were not justified under

section 2 of the self-defense act, Michigan Compiled Laws § 780.972.  The

Michigan Court of Appeals rejected Petitioner's claim, reasoning:

> Even assuming that the prosecutor failed to present such evidence at the time of the warrant issuance or the preliminary examination, we are at a loss to determine what the appropriate remedy would be at this point.  The requirement obviously is intended to prevent a defendant who has a claim of self-defense from having to go trial unless the prosecutor has sufficient evidence to defeat the claim of self-defense.  But the trial has happened and we cannot relieve defendant of the burden of defending herself at a trial that has already happened.  As for the requirement that evidence be presented at trial, that has happened and the jury rejected the claim of self-defense.

*Jones*, 2017 WL 3613902, at *6.

"A claim based *solely* on an error of state law is not redressable through the

federal habeas process."  *See Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998)

(citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Hutchison v. Marshall*, 744

F.2d 44, 46-47 (6th Cir. 1984)).  Redress is available only where a violation of

state law "has rendered the trial that convicted the [petitioner] so fundamentally

unfair as to have deprived [the petitioner] of substantive due process in violation of

the U.S. Constitution[.]"  *Id.* (citing *Estelle*, 502 U.S. at 67-68; *Serra v. Mich.*

*Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993)).  As there was sufficient

evidence presented at Petitioner's trial to undermine her self-defense claim, that is

not the situation here.

## IV.   Conclusion

For the reasons set forth above, the Court is denying Petitioner's application for habeas corpus relief.  Before Petitioner may appeal this decision, she must obtain a certificate of appealability.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).  Petitioner fails to make this showing.  Nevertheless, the issues raised are not frivolous.  Therefore, an appeal could be taken in good faith and Petitioner may proceed *in forma pauperis* on appeal.  *See* 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

Accordingly,

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Petitioner is **DENIED** a certificate of

appealability but is **GRANTED** leave to appeal *in forma pauperis.*

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: January 31, 2024

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, January 31, 2024, by electronic and/or U.S. First Class mail.

s/Aaron Flanigan
Case Manager

34